LIONEL Z. GLANCY (#134180)
LOUIS N. BOYARSKY (#263379)
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

*Attorneys for Plaintiff*
[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD PFEFFER,<br><br>               Plaintiff,<br><br>     v.<br><br>BRUCE C. EDWARDS an individual;<br>JEFFREY W. BENCK an individual;<br>GREGORY S. CLARK an individual;<br>PAUL F. FOLINO  an individual;<br>EUGENE J. FRANZ an individual;<br>BEATRIZ V. INFANTE , an individual;<br>NERSI NAZARI an individual;<br>and DEAN A. YOOST, an individual;<br><br>           Defendants.<br><br>EMULEX Corp.<br><br>          Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Richard Pfeffer ("Plaintiff"), by his attorneys, alleges this shareholder's derivative complaint against the individual defendants (the "Individual Defendants") named herein.  The allegations are asserted on information and belief after due investigation, except as to those matters which relate to Plaintiff and his own acts, which are asserted on personal knowledge.

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action (the "Action") brought for the benefit of nominal defendant Emulex Corp. ("Emulex" or the "Company") against certain members of the Emulex Board of Directors.

2.      Emulex is a public company which produces products in the highly competitive field of computer networking solutions.  It sells most of its products to a small number of companies, with whom it has no firm contracts.  Competition is fierce, and prices Emulex can command for its products are heading in the wrong direction—downward.  Emulex has many well-financed competitors. These competitors are always working on new products which may undermine the Company's core business. Moreover, products Emulex has relied upon for years to sustain its business are subject to weakening demand and threatened by technological advances.  To survive and thrive, Emulex must constantly innovate, and expand its product lines and technologies.  Doing so requires a solid balance sheet, plenty of cash, and the flexibility to make acquisitions.

3.      On various occasions, Emulex has been approached with takeover overtures. These have been rebuffed.  Any takeover may well result in the Board members losing their prestigious and lucrative positions.  In 2012 and 2013, activist investor funds (the "Activist Investors"), began acquiring shares in Emulex and suggesting that the Board needed to be replaced with more independent directors. As Emulex is a Delaware corporation, its Board has three primary duties when faced with the "conflict of interest" threats to replace the Board create: (1) it must determine if such overtures are a "threat" to the Company's business interests; (2) it

1    must fully inform itself of the Company's options; and (3) it must ensure that any

2    actions it takes are not disproportionate to the threat presented.  *See Unocal v. Mesa*

3    *Petroleum Co.,* 493 A.2d 946 (Del. 1985).  If the Board's actions are challenged in

4    Court, the burden is on the Board to prove it acted reasonably and proportionately,

5    with the Court exercising "enhanced scrutiny" with regard to whether it did so.

6        4.    In 2013, as the Activist Investors exerted increasing pressure, the

7    Emulex Board panicked, entering into agreements which benefitted the Activist

8    Investors at the expense of the Company and the public shareholders.   These

9    agreements, while preserving the Board seats of most of the directors, has hobbled

10   the Company's ability to compete, innovate, and grow.   In essence, Emulex—a

11   Company with a dire need to preserve cash to help it navigate a perilous business

12   environment--committed to go into debt so that it might buy back $200 million

13   worth of its own shares, including many shares from the Activist Investors (the

14   "Defensive Buyback").  It also agreed to rash cost-cutting measures. This was the

15   epitome of an unreasonable and disproportionate response to the "threat" posed by

16   the Activist Investors.  Within months of the November 2013 announcement that

17   Emulex would take these actions, its business plummeted.  Its stock price has fallen

18   roughly 33%, often trading below $5 per share.  For the nine months ended March

19   30, 2014, it reported a net loss of $14.87 million, compared to a net loss of only

20   $604,000 for the comparable nine month period ending March 30, 2013.  Incredibly,

21   it has not backed off its stock buyback plan, despite admitting that demand has

22   slowed, and that it has difficulty predicting when and if there will be any

23   improvement.

24       5.    In, sum, Plaintiff seeks to recover damages inflicted upon Emulex by:

25   (a) an $200 million Defensive Buyback, which has the purpose and effect of

26   entrenching the Board, while severely depleting the resources Emulex needs to

27   compete;  (b) the issuance of $175 million in potentially dilutive Convertible Senior

28   Notes (the "Debt Offering") sold to raise funds for the Defensive Buyback; and (c)

the Board's agreement to a cost-cutting program resulting in the termination of a number of employees necessary for the business to properly operate.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter jurisdiction over this Action pursuant to 28 U.S.C. §1332 (diversity jurisdiction).   As to such diversity jurisdiction, Plaintiff is a citizen of the Florida while each defendant is a citizen of a state other than Florida.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  A number of the claimed wrongful acts and practices asserted herein occurred in this District.

8.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, the Internet and the facilities of the national securities exchange.

## PARTIES

9.     Plaintiff has owned Emulex shares continuously since 2007.  He is a citizen of Florida.

10.     Defendant Jeffrey W. Benck currently serves as a Director, Chief Executive Officer and President of Emulex.  Defendant Benck joined Emulex in August 2008 as Executive Vice President and Chief Operating Officer and was subsequently appointed to President and Chief Operating Officer in August 2010.  Mr. Benck was named a Director of Emulex and President and Chief Executive Officer of the Company on or about July 12, 2013.   Benck's compensation is substantial.  He earns a base salary of $510,000, and has received stock and option awards in the past 3 years valued as of the date of grant as worth in excess of $2.6 million.  His total compensation for the past 3 years was valued at over $4.8 million.

He is a citizen of California.

11.     Defendant Gregory S. Clark has served as a Director of Emulex since April 2013. Mr. Clark is currently the Chief Executive Officer and a Director of Blue Coat Systems, Inc., a developer of products and services that secure and optimize the delivery of business applications. Clark was selected as a director nominee pursuant to the terms of a March 27, 2013 Letter Agreement with one of the Activist Investors, The Elliott Group. Upon his appointment to the Board, Clark received a restricted stock grant worth $200,000, and (like all directors) is entitled to further stock awards annually worth $125,000 plus at least $55,000 in meeting attendance fees.  He is a citizen of California.

12.     Defendant Bruce C. Edwards has served as a Director of Emulex since May 2000 and is Chairman of the Board.  He is a citizen of California.

13.     Defendant Paul F. Folino currently serves as a Director of Emulex.  Mr. Folino joined Emulex in May 1993 as President, Chief Executive Officer and Director. Mr. Folino served as Chairman of the Board from July 2002 through July 2013 and served in the office of Executive Chairman of Emulex from September 2006 through November 2011.  Folino served as Chief Executive Officer of Emulex for more than 14 years and served as Chairman for over ten years. He is a citizen of California.

14.     Defendant Eugene J. Frantz has served as a Director of Emulex since April 2013.  Mr. Frantz was selected as a director nominee pursuant to the terms of the aforementioned March 2013 Letter Agreement with The Elliott Group. He is a citizen of California.

15.     Defendant Beatriz V. Infante has served as a Director of Emulex since May 2012.  She is a citizen of California.

16.     Defendant Nersi Nazari has served as a Director of Emulex since June 2011.  He is a citizen of California.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17.     Defendant Dean A. Yoost has served as a Director of Emulex since August 2005.  He is a citizen of California.

18.     Nominal Defendant Emulex Corporation provides connectivity, monitoring, and management products for networks that support enterprise, cloud, government, and telecommunications worldwide. Emulex Corporation was founded in 1979 and is headquartered in Costa Mesa, California.  Its stock trades on the New York Stock Exchange under the symbol "ELX."  Emulex is a citizen of Delaware and California.

## **FACTUAL ALLEGATIONS**

19.     Emulex, once an Internet high-flier, never recovered from the recession that hit full force in 2008. It began 2008 trading at $16.03 per share, and ended the year trading at just $6.98 per share.  The slumping stock price attracted the attention of rival Broadcom, which approached Emulex about a possible merger in late 2008. It was rebuffed.

20.     On May 5, 2009 Broadcom went public with a hostile bid at $9.25 a share.  In an SEC filing on that day, Broadcom noted:

On April 20, 2009, the last full trading day before Parent publicly announced its proposal to acquire all of the outstanding shares of common stock of Emulex for $9.25 per Share in cash, the last reported closing price per share of common stock reported on the New York Stock Exchange was $6.61 per share of common stock. On May 4, 2009, the last full trading day before Purchaser commenced this Offer, the last reported closing price per share of common stock reported on the New York Stock Exchange was $10.75 per share of common stock.

Purchaser's Offer price of $9.25 per Share offers the following premiums:

- a 40% premium to the price per share of common stock as of the close of trading on April 20, 2009, the last full trading day before Broadcom publicly announced its proposal to acquire the Company;

- a 62% premium to the average closing price per share of common stock for the 30 NYSE trading days immediately preceding April 21, 2009;

- an approximately 85% premium relative to the Company's enterprise value prior to the public announcement of Broadcom's proposal to acquire Emulex ("enterprise value" is the Company's market equity value plus the Company's aggregate indebtedness minus the Company's cash and cash equivalents); and

- a 42% premium to the median 12 month price target established by analysts prior to the public announcement of Broadcom's proposal to acquire Emulex.

21.     This offer amounted to $764 million.  Had the offer been accepted, and the funds received re-invested in the market, these funds would now be worth more than $1.5 billion.  But the offer was not accepted, and Emulex is now worth roughly $408 million, over *$1 billion less.*  (Broadcom stock is up 40% since the bid was made, not counting dividends).

22.     In advocating for the deal, Broadcom's CEO Scott McGregor asserted that Emulex had failed to convert contract wins into significant revenue.  Broadcom also contended that it could help Emulex broaden its customer base.

23.     In late June 2009, Broadcom raised its bid to $11 per share, equivalent to $912 million.  Had this offer been accepted, the funds received if re-invested in the market would today be worth almost $2 billion, compared with Emulex's current $408 million value.  But the offer was not accepted. The Emulex Board claimed it

was inadequate given the Company's supposedly stellar prospects.   The offer expired on July 14, 2009, never to be revived.  Emulex shares closed at $8.72 per share that day.

24.    In early 2012, activist shareholder, Elliott Management started to acquire a significant position in Emulex stock which position grew over time. By November 15, 2012, Elliott Management had acquired approximately 9.7% of Emulex outstanding shares at prices ranging from $8.15 to $9.70 per share.

25.    On Feb. 22, 2013 *The Register* reported that Emulex had drawn the attention of a second activist fund: "Emulex, faced with a relatively static Fibre Channel HBA market and with the great white Ethernet-carrying FCoE alternative being as lively as a lethargic turtle, has decided to buy Endace, a New Zealand–based concern with Ethernet deep traffic inspection and analysis gear, so as to expand its addressable market. This got up Elliot Management's nose, hence its assault on the board. *Now Altai Capital has revealed itself as a second aggrieved investor.....*"

26.    In a letter to Emulex's CEO dated Feb. 20, 2013, Altai wrote that the Board should consider certain "questions", including whether it should add new Board members with a greater stake in the Company; whether it should consider a possible sale of the Company; and whether the Company should "return capital to shareholders immediately through increased share repurchases."  On May 7, 2013

Altai sent a letter to Emulex CEO McCluney, stating in part:

> Given your sizable forecast miss in the midst of a decision that had enormous economic consequences for your shareholders, we believe it will take many years for management to regain credibility in the public markets. Still, we are confident that Emulex continues to possess valuable assets and has a bright future. We contend that the best course of action is for Emulex to initiate a sale process, and we therefore request that the current Board engage financial advisors immediately to undertake this task in earnest. We believe that a sophisticated buyer with the opportunity to properly diligence the Company could pay a healthy premium to today's share price and still earn an excellent return.
>
> Absent a sale of the entire business, *Altai Capital would only be satisfied as a long-term shareholder in the event of wholesale change at the Board level*. The Board members who rejected Broadcom's $11 per share bid for Emulex and/or oversaw the Endace transaction have done shareholders a significant disservice. Therefore, we intend to consider all of our options with regard to this year's annual meeting in order to restore investor confidence and ultimately improve outcomes for shareholders.

27.     Many activist investor funds have lately threatened Boards with replacement, only later to agree to leave them in place should the activist be paid a premium price, directly or indirectly via a share buyback. The most aggressive of these activist funds have established that the price of peace is a buyback so large, that it sends the Company into debt, and hobbles its future prospects. They then completely or largely exit their investments, leaving the Company and its shareholders to suffer the long-term consequences. This is the scenario that played out here.

28.     Pressured behind the scenes, the Director Defendants entered into a

standstill with the Elliott Group. This Standstill Agreement provided as follows (as described by the Company in an SEC filing):

> On March 27, 2013, Emulex entered into a letter agreement (the "Letter Agreement") with Elliott Associates, L. P . and certain affiliated entities (collectively , the "Elliot Group "), pursuant to which Emulex agreed to (i) increase the size of the Board to eleven members and (ii) nominate two new independent directors, Gregory S. Clark and Eugene J. Frantz, to serve on the Board and be included in the Board's slate of nominees for our next annual meeting of stockholders. Under the Letter Agreement, the Elliott Group agreed to comply with certain standstill restrictions with respect to their ownership of Emulex common stock and certain other matters.

29.    In mid-2013, another hedge fund, Starboard Value LP began to acquire Emulex shares.  By July 15, 2013 it held approximately 6.9% of the Company's outstanding common stock.

30.    The Defendant Directors, who together with executive officers owned less than 4% of the Company's shares, were alarmed by these developments and fearful that they might be ousted from their positions.

31.    On September 13, 2013, Starboard Value announced that it had delivered a letter to the Company's President and CEO, Jeffrey Benck, and the Company's Board of Directors.  In the letter, Starboard expressed that based on its extensive research and analysis, Emulex was extremely undervalued and clear opportunities exist within the control of Emulex's management team and Board of Directors to unlock significant shareholder value.

32.     In the letter, Starboard also outlined its thoughts and concerns about the Company's past underperformance, as well as Starboard's views on the steps required to unlock value for the benefit of all Emulex shareholders.

33.     The full text of the letter follows excluding certain charts:

September 16, 2013

Jeffrey W. Benck
President and Chief Executive Officer
Emulex Corporation
3333 Susan Street
Costa Mesa, CA 92626

cc: Board of Directors

Dear Jeff,

Starboard Value LP, together with its affiliates ("Starboard"), currently owns securities representing beneficial ownership of approximately 7.9% of the outstanding shares of Emulex Corporation ("Emulex" or the "Company"), making us one of the Company's largest shareholders. We have conducted extensive research on Emulex, its different businesses, and the markets in which those businesses operate. Based on this research, we believe Emulex is extremely undervalued and that clear opportunities exist within the control of management and the Board of Directors of the Company (the "Board") to unlock significant shareholder value.

We appreciate the time that you and your senior management team have spent with us during our research process. We have enjoyed the meetings and phone conversations that we have had with you and particularly appreciated the opportunity to discuss your views on Emulex's business and the challenges it faces.

We are writing to express our disappointment with the Company's fiscal fourth quarter results and to urge you to take immediate action to address Emulex's poor operating and share price performance. As you can see in the chart below, Emulex's share price has underperformed both its peer group and the broader market over virtually every time

frame.  Over the past five years alone, Emulex's share price had declined over 40% prior to July 3, 2013, the date of the first news report speculating that the Company had engaged a financial advisor to explore strategic alternatives. As of July 2, Emulex's share price was $6.66, which is 39% lower than the $11.00 all-cash offer to acquire the Company made by Broadcom Corporation in 2009 that the Board rejected.

Even if compared to the current stock price, which arguably reflects some level of deal speculation, Emulex has materially underperformed over almost any time frame.

After years of underperformance, we believe Emulex's current share price does not properly reflect the value of its underlying assets. Despite the recent concerns about growth, we believe Emulex's core fibre channel HBA product segment is a valuable asset that will continue to generate strong cash flow for years to come.  The fibre channel adapter market has been clouded by concerns about a secular decline.  However, we believe that these concerns are overblown and that decline rates may be far less than feared.  As is typical in many technology markets, legacy technologies tend to last longer than expected and new technologies take significantly longer to proliferate. Fibre channel technology has been the standard for over 20 years and there are still thousands of customers who are committed to maintaining their fibre channel network infrastructure due to the reliability and speed of this technology.  This business is particularly attractive because the market for fibre channel adapters is a duopoly, where Emulex has historically enjoyed high margins.

In addition to the fibre channel business, Emulex has developed market leading technology and owns significant intellectual property related to several high-growth products.  Despite the recent challenges, Emulex's 10Gigabit Ethernet (10GbE) and Fibre Channel over Ethernet (FCoE) businesses have grown dramatically and have achieved leading market share positions.  We believe that Emulex is undervalued for a variety of reasons, but primarily due to the Company's long history of poor capital allocation decisions. Specifically, Emulex has spent billions of dollars on research & development and acquisitions, yet has consistently failed to generate returns in excess of its cost of capital.  Management has made a habit of announcing large acquisitions and investments, ***setting unrealistic***

*growth expectations* and then lowering those expectations over time. This has forced investors to heavily discount management's guidance, contributing to the depressed multiple at which the stock trades.

Since 2005, Emulex's EBITDA margins have declined from 34.8% to 10.7% as growth in operating expenses has far outpaced growth in revenue. Research & development expenses have doubled and have consistently exceeded 30% of sales, yet the Company has been growth-challenged in recent years. ***This continued increase in expenses has compounded the impact from the decline in the fibre channel business.*** The most recent example of this is apparent in Emulex's 2013 fiscal fourth quarter results. During the quarter, revenue declined 6.7%, yet operating expenses increased a staggering 22.2%, in large part due to the acquisition of Endace Limited ("Endace"), which was completed on April 1, 2013. The $10 million of announced cost savings during the quarter only partially offsets the increase in spending associated with the Endace acquisition and is by no means sufficient to offset the years of growth in operating expenses without commensurate revenue growth.

Over the past 10 years, Emulex has spent more than $2.4 billion on investments, including over $900 million on acquisitions, $1.3 billion on research & development and $230 million on capital expenditures. Despite these massive investments, Emulex's share price has languished, declining 76% since 2003. Over the same period, Emulex's enterprise value has been reduced to less than $600 million, a small fraction of the historical investments made. Clearly, there has been a persistent lack of discipline around capital allocation as many of these past investments have failed to produce a positive return. The most recent example of this is the poorly timed acquisition of Endace. While we agree that Endace is a potentially valuable business, we question the strategic logic and the timing behind the acquisition. Given the unique set of challenges that the Company currently faces, we believe that the management team should be wholly focused on improving the core business, rather than focused on expanding into new markets with large acquisitions. ***The acquisition of Endace for $130 million represented 75% of the Company's cash balance at the time of the acquisition***. This is a huge bet despite (i) an unclear strategic rationale for the transaction, and (ii) the Company's dismal track record of capital allocation, particularly as it relates to acquisitions.

As a result of this historical track record, we believe that shareholders are skeptical of management's ability to properly allocate capital and manage expenses, and the weak fourth quarter results have only fueled this skepticism.  While we recognize the Company has recently made a management change, it is unclear at this juncture whether the strategy going forward will be materially different from the past.  Thus far, there has been no disclosure regarding step function changes in cost structure, desired profitability, or strategic vision.  It appears the current plan is very much the status quo.

Also troubling is that the composition of the Board has remained stagnant with little change despite dismal performance.  Apart from the addition of two new independent directors at the request of your largest shareholder earlier this year, the remainder of the Board is composed primarily of long-time directors, who collectively have an average tenure on the Board of over 15 years.  Further, instead of implementing corporate governance best practices by having former CEOs step down from the Board upon their resignation as CEO, Emulex has made a terrible habit of allowing former CEOs to remain on the Board.  In fact, the current Chairman is the former CEO, and the former Chairman, who remains on the Board, is a former CEO who served from 1993-2006.  If allowing former CEOs to continue to serve as Board members was not bad enough, the recent appointment of Jim McCluney as Chairman came with it a compensation agreement that entitles Mr. McCluney to a compensation package commensurate with what he earned while CEO.  When combined with your promotion to CEO and associated compensation increases, Emulex is now effectively paying two CEO compensation packages.

It is time for a significant change at Emulex.  Specific changes must be made to address years of dismal operating and share price performance as well as sub-optimal corporate governance.  ***We believe a newly reconstituted Board comprised of independent directors and shareholder advocates should be able to evaluate each of Emulex's businesses with a fresh perspective and determine the right strategy to enhance shareholder value.***  We believe it is critical for the Board to adopt a disciplined framework by which to analyze the current cost structure, strategic positioning, and future capital allocation decisions.  In addition, we believe that the Board must set margin targets that imply step-function improvements in profitability across each of its

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

businesses and then use these targets to hold management accountable for performance.

We believe it is time for you to take immediate action to address the concerns of shareholders.  We remain open to further discussions with you and the Board and are committed to ensuring that the best interests of all shareholders are represented.

Sincerely,
/s/ Peter A. Feld
Peter A. Feld
Managing Member
Starboard Value LP

34.    As this letter emphasizes, the one thing that Emulex would wish to avoid was depleting cash that could be used to strengthen its core business.  But the Activist Investors were not truly seeking this result. What the Activist Investors were truly pushing behind the scenes was a huge stock buyback, which would *deplete long-term operating capital,* but benefit them immediately.  They succeeded in obtaining this. The *quid pro quo* was that they would leave the Board alone.

35.    On November 11, 2013,  Emulex and the Elliott Group entered into an agreement that reinstated the Elliott Group standstill agreement that had expired on October 20,  2013 until the earlier of November 11,  2014 and 10 days prior to the deadline for director nominations for the annual meeting of stockholders for fiscal 2015,  subject to certain exceptions.    In addition, Emulex and the Elliott Group agreed that Emulex will (i) reduce the number of directors to eleven from the current twelve (subject to increase in certain circumstances), and (ii) include in this Proxy Statement and cause proxies to be voted pro-rata for the three New Director

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Nominees, which were selected by the Board and recommended by the Nominating/ Corporate Governance Committee in collaboration with the Elliott Group.   In addition, the Elliott Group agreed to vote its shares pro-rata for the three New Director Nominees as well as the eight incumbent director nominees.

36.   On November 11, 2013, Emulex issued a press release describing its complete capitulation to the activist investors. It stated:

> Emulex Corporation (NYSE: ELX), a leader in network connectivity, monitoring and management, today announced that the Emulex Board of Directors **has approved a $200 million share repurchase program, which at current market prices represents approximately 30 percent of the Company's outstanding shares. The Company today is also announcing a cost savings program that is expected to generate $30 million in annual cost savings over the fiscal 2013 spending level, expanding on the previously announced $10 million cost savings initiative in its connectivity business. Emulex expects to complete this effort over the next few quarters and will provide quarterly progress updates on the savings, with the full run-rate benefits of this program expected to be realized in fiscal 2015. These actions are being undertaken to immediately return capital to shareholders** while at the same time pursuing significant increases in the profitability and free cash flow of the Company. Finally, Emulex is adding three new experienced executives to the Board of Directors who will help drive the Company's transformation.
>
> "**The Board and management team have collaborated with key shareholders to formulate these strategic actions,** which reflect our confidence in our underlying business as well as our commitment to enhancing shareholder value," said Jeff Benck, president and CEO, Emulex. "We have already exceeded our initial goal of identifying $10 million in annualized savings. We expect to achieve the $30 million annualized expense reductions by simplifying our product portfolio, discontinuing additional lower return on investment programs, pursuing some

consolidation opportunities and identifying further efficiencies. The changes announced today mark important initial steps in our efforts to maximize operational efficiency while continuing our revenue growth initiatives, all as part of a strong commitment to generating incremental increases in stockholder value. I will share updates on our progress and next steps on future earnings calls."

The Company announced that it is actively interviewing industry expert candidates that will be selected to fill three positions that will be identified in its proxy statement as independent nominees to the Board of Directors. Further, Emulex plans to reduce the size of its board from 12 to 11 directors.

Benck continued, "In pursuit of our strategic goals, the Emulex Board has determined that now is the appropriate time to bring additional external talent to the Board as we continue to work to increase shareholder value."

"We are very pleased with today's announcement of Emulex's shareholder value plan," said Jesse Cohn, a Portfolio Manager at Elliott Management, which manages funds that together are the largest shareholder of Emulex. "The meaningful cost reduction initiatives, the plan to return significant capital to shareholders and the Board transformation at Emulex are all positive steps marking a renewed commitment to and focus on value at the Company. We worked collaboratively with the Emulex Board, Jeff and the rest of the management team to review these plans, which we believe have great potential to create significant value for shareholders both in the near and long term."

The Emulex Board has approved a $200 million share repurchase program to commence immediately. The Company expects that the initial $100 million will be completed through the combination of individually negotiated transactions and entry into an Accelerated Share Repurchase program ("ASR"). Additional information about the ASR will be filed with the Securities and Exchange Commission, and it is currently anticipated to be completed by end of fiscal 2014. Subject to

market conditions and business outlook, the Company expects to initiate the second $100 million return of capital program immediately after the completion of the ASR. Emulex expects to fund the share repurchase program with working capital and financing sources available to the Company. The timing and amount of any shares repurchased will be determined by the Company's management based on its evaluation of market conditions, the trading price of the stock, the Company's cash needs, securities law limitations and other factors. The repurchase program may be suspended or discontinued at any time.

Emulex expects to take a material incremental charge related to the further operating expense reductions in the Company's GAAP results and cash flows for the second quarter of 2014.

The Company also announced that its Executive Chairman, Jim McCluney, will be continuing with the Company through February 6, 2014, after which he will depart in accordance with his employment agreement, and he will not stand for re-election to the board of directors at the next annual meeting of stockholders.

"I am pleased to support Jeff Benck in a successful transition for the benefit of the company, its stockholders, employees and customers," said McCluney. "Jim has impressed me with the way he always put the customers first, the kind of deep partnerships he built, and his commitment to invest for the future. Jim will be deeply missed by the Emulex family, and we want to thank him personally for his service and devotion to the company," Benck concluded.

37.   On December 11, 2013, the Company issued a press release as follows:

Emulex Corporation (NYSE: ELX), a leader in network connectivity, monitoring and management, today announced that it has implemented a restructuring plan designed to streamline business operations with the goal of driving long-term shareholder value. This restructuring plan is part of the three-part transformation initiative announced last month to

improve profitability, increase cash flow and enhance shareholder value. The restructuring will include a workforce reduction of 110 people or approximately 10 percent, the consolidation of some engineering activities, and the closure of the Company's Bolton, Massachusetts engineering facility. These actions are part of an overall plan to reduce costs in the Company's core business while allowing continued investment in market expansion initiatives and will result in a more streamlined and focused organization.

We are taking these actions to enhance our business model and also deliver on the cost reduction plan that we previously announced. This announcement reinforces our focus toward streamlining our operations with a sense of urgency to deliver increased profitability and cash flow, all with the goal to enhance value to shareholders, said Jeff Benck, President and CEO, Emulex. Impacting great people is never an easy decision to make but we assessed our long-term needs and consolidating U.S. facilities became a necessity to reach the next level of efficiency. These changes will also allow us to continue to invest in our technology roadmap to ensure our long-term success. We have communicated the impact of these changes to our customers and have verified that we can meet their future needs.

The Company expects to have the restructuring completed and the transition of the Bolton, Massachusetts facility finished by the end of fiscal year 2014 at which time the site will close. This timing is consistent with the cost savings program Emulex announced last month, which is expected to deliver $30 million in annual cost savings in our connectivity business over the fiscal year 2013 spending level, with the full run-rate benefits of the program expected to be realized in fiscal year 2015.

As previously stated, Emulex expects to take a material incremental charge related to the further operating expense reductions in the Company's GAAP results and cash flows for the second quarter of fiscal year 2014. Emulex estimates that it will incur pre-tax GAAP charges in the range of $9 to $10 million in connection with these restructuring actions, the majority of which will be recorded during the second quarter of

fiscal year 2014. The restructuring is expected to include between $8 million and $9 million for severance and one-time termination benefits (inclusive of costs associated with the previously announced departure of Jim McCluney), and approximately $1 million for lease termination costs and asset impairments charges. The Company reaffirms its previously announced non-GAAP financial guidance for the second quarter of fiscal year 2014. Emulex will share additional details on its corporate restructuring on next month's earnings call.

38.     Given the Company's wide array of vexing business problems, an expenditure of $200 million at prices inflated by activist investor agitation was entirely unreasonable and irrational.  Just prior to the deal being struck, Emulex filed its Annual Report describing challenges as of June 30, 2013 that would seriously strain much larger and better-capitalized companies:

--Despite rapidly changing competitive technologies, the Company's spending on engineering and development had stagnated, even declining between fiscal 2011 and fiscal 2013;

--The Company needed to expand is marketing efforts to diversify its customer base. It warned that "a significant portion of our revenues are generated from sales to a limited number of customers";

--Business planning and projections based on backlog was not possible "[d]ue to an industry practice that allows customers to cancel or change orders with limited advance notice prior to shipment….";

--The need for research and development was acute as "[t]he market for our products remains intensely competitive and is characterized by frequent new product introductions rapid technological change changing customer preferences evolving technology and industry standards";

--The key competitor in the Company's main business is QLogic Corp., a company with much greater resources (and now, as a result, of the buyback and debt offering) twice the working capital as Emulex;

--New, well-financed entrants were entering the Company's markets, such as Intel and Broadcom;

--Emulex relies heavily on sales to Original Equipment Manufacturers ("OEMs"), but a troublesome trend had emerged: "the growth of white box manufacturers and web giants has shifted server market share away from OEMs and enterprise end-users in recent years.";

--Macroeconomic conditions were worrisome: "The current weakness in domestic and worldwide economic conditions and related disruptions in world credit and equity markets as well as the European debt crisis have resulted in global downturn in spending on information technology If the continuing weakness and uncertainty in the global economy result in significant reductions in the demand for our products solutions and applications it will adversely affect our business results of operations and financial condition in the near term and possibly beyond";

--Pricing was in a downward trend: "We continue to experience downward pressure on the average unit selling prices of our products. Furthermore we may provide pricing discounts to customers based upon volume purchase criteria and achievement of such discounts may reduce our average unit selling prices."

39.    In additional to the above, Emulex warned that it might need new capital:

**We may need additional capital in the future and such additional financing may not be available on favorable terms**

While we believe we have adequate working capital to meet our expected cash requirements for the next 12 months we may need to raise additional funds through public or private debt or equity financings in the future for various purposes including

- Acquisitions of or strategic investments in complementary businesses or technologies
- International expansion
- Development of new products or services
- Unanticipated competitive pressures and
- Unexpected tax or litigation costs and settlements

39.    As a result of the pressure exerted by the Activist Investors, the Board agreed to the share buy back and the issuance of debt, and the "cost saving program", in an effort to protect the Board and their jobs, not in an effort to help the Company.  Rather the efforts by the Board were an entrenchment device, violative of the Board's fiduciary duties.  Spending $200 million on a buyback which does not address the Company's serious business challenges was not the Company's business plan, and is not a rational business plan. It is an entrenchment plan.

40.    This conduct violated the *Unocal* Rule which prohibits a corporate Board from entrenching itself through disproportionate and unreasonable measures that are contrary to the best interests of the company.  *See Unocal Corp. v. Mesa Petroleum*, 493 A.2d 946 (Del. 1985).

41.    The Activist Investors recognized that what benefitted them in the near term was bad for Emulex in the long term. When the buyback plan was struck, they immediately began exiting their investment positions. On November 20, 2013 an article appeared entitled "Starboard Value, Elliott Associates Sells Shares of Emulex Corporation."[1]  It reported:

> Jeffrey Smith's hedge fund, Starboard Value disclosed recently cutting its position to around 4.1 million shares. This is already the second decline that Starboard is applying towards its holding in Emulex. ***Last week, the fund reduced its stake to 5.34 million shares, from 7.25 million held earlier.*** The position held currently by Starboard amasses 4.4% of the

---

[1] Available at: http://www.insidermonkey.com/blog/starboard-value-elliott-associates-sell-shares-of-emulex-corporation-292466/

company's common stock, down from 5.8%. Jeff Smith's fund also revealed a purchase agreement signed with Emulex, under the terms of which the fund agrees *to sell 600,000 shares of the company back to Emulex for an aggregate price of $4.7 million*. In a separate filing, Paul Singer's fund Elliott Associates reported that *it now holds around 7.5 million shares of Emulex, down from over 8.9 million held according to an earlier filing.*

42.    The Activist Investors have continued this bail out from their equity positions.  In a May 9, 2014 SEC filing, Elliott Associates and affiliates reported holdings of 3.28 million shares, down from their high of 8.9 million shares, and 4.38 million shares held on Dec. 31, 2013. In a March 17, 2014 SEC filing, activist investor Altai reported holdings of 3.7 million shares, down from 4.77 million shares. Likewise, Starboard Value and affiliates reduced its holdings to 3.8 million shares, from a high of 7.25 million shares.

43.    The adverse effects of these events came home to roost for Emulex almost immediately.  As it spend huge sums needlessly on buybacks and cut back resources, its core business declines accelerated. On April 30, 2014 Emulex announced poor results and an even poorer forecast.  For the fiscal third quarter ending March 30, 2014, Emulex reported a year-over-year decline in revenue of 6% to $109.7 million, and an adjusted profit of $0.15 per share. For the nine months ended March 30, 2014, it reported a net loss of $14.87 million, compared to a net loss of only $604,000 for the comparable nine month period ending March 30, 2013. Fourth-quarter guidance called for revenue of $94 million-$100 million and an

adjusted profit of breakeven to $0.05 per share. Wall Street's consensus had been expecting $0.18 in EPS and $115.4 million in sales.

44.     The stock price plummeted from $7.15 per share to $4.96 per share as the close of trading in May 1, 2014.  The stock closed at $5.01 on May 16, 2014.

45.     On May 14, 214, stock analyst Brian Nichols posted an article on financial website SeekingAlpha.com, observing *inter alia*:

> *Over the last five years, Emulex has significantly underperformed the market, as the need for many of its best-selling products has diminished, which is also what we saw in its first quarter.*
>
> On May 1, Emulex reported earnings that then caused its stock to lose a quarter of its valuation. While its 6.1% year-over-year revenue loss caused the company to miss expectations, it was guidance for second quarter sales of $97 million that fell far short of the $115.7 million consensus. Notably, its EPS was also short of expectations.
>
> Overall, Emulex's poor performance was a reflection of the industry. Nearly three quarters of its revenue comes from network connectivity, and it fell 9%. Specifically, server sales remain poor; IDC estimates that global server revenue declined 4.4% in the fourth quarter, an acceleration to the losses in prior quarters. This includes x86 servers, which have seen double-digit declines in recent months due to software innovations.
>
> If we look even deeper into the catastrophic quarter of Emulex, its storage connectivity business, which makes up about 20% of revenue, has also suffered. It's expected to decline low double-digits this year and up to 30% next year.

46.     Despite all of this, Emulex stated in a May 12, 2014 SEC filing that its repurchase program is proceeding:

On May 9, 2014, Emulex Corporation (the "Company") announced that it had completed the previously announced $100 million accelerated share repurchase program contemplated by the Master Confirmation Agreement, dated as of November 13, 2013, and related Supplemental Confirmation, dated as of November 18, 2013 (collectively, the "ASB Agreement") with Goldman Sachs & Co. Details as to the ASB Agreement are contained in the Company's Current Report on Form 8-K filed on November 21, 2013. Under the ASB Agreement, the Company repurchased an aggregate of 6,085,244 shares of its common stock for an aggregate purchase price of $44,261,690.

Since March 30, 2014 (the end of the third fiscal quarter), the Company has obtained, as the final delivery pursuant to the ASB Agreement, the amount of 1,462,613 shares of its common stock, which are included in the aggregate number of 6,085,244 shares mentioned above.

As previously announced, the accelerated share repurchase program was part of a $200 million stock repurchase program approved by the Company's Board of Directors in November 2013. The share repurchases are authorized to be completed through the combination of individually negotiated transactions, accelerated share buybacks, and open market purchases.

As part of the stock repurchase program and in addition to the accelerated stock repurchase program, the Company has adopted and entered into a repurchase plan designed to comply with the requirements of Rule 10b5-1 of the Securities Exchange Act of 1934 (the "10b5-1 Repurchase Plan"). In connection with the 10b5-1 Repurchase Plan, the Company entered into an agreement pursuant to which it has instructed Goldman Sachs & Co. to repurchase an aggregate of $50 million of Company common stock in open market transactions in accordance with pre-determined price and volume criteria. *Since March 30, 2014 (the end of the third fiscal quarter) the Company has repurchased, in the open market (and not pursuant to the ASB Agreement), an aggregate of 1,497,446 shares of its common stock as of May 9, 2014 at an average price of $5.42 per share for a total of approximately $8.1*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*million. Approximately $38.5 million of repurchases remain under the 10b5-1 Repurchase Plan.*

47.   Emulex has been severely injured by the events described in this Complaint, and a derivative recovery for the Company is needed and appropriate. Moreover, to the extent the Company has not yet completed the Buyback, it should not do so.

## C.   DERIVATIVE DEMAND ALLEGATIONS

48.   Plaintiff brings this action as a derivative action pursuant to Federal Rules of Civil Procedure 23.1 on behalf of and for the benefit of Emulex.

49.   Plaintiff will fairly and adequately represent the interests of Emulex in enforcing and prosecuting its rights, and has retained competent counsel experienced in this type of litigation.

50.   Demand on the Emulex Board to bring this action was not been made and is excused because such demand would be have been futile.  Under Delaware law, demand futility is measured as of the time of the filing of the initial complaint. As of the filing of the constituent Complaints, the Emulex Board consists of eleven Directors, eight of whom approved the wrongful entrenchment measures, including the buyback and the debt offering (including defendant Benck as CEO and an officer, and soon to be appointed a director). These directors are the eight Individual Defendants herein.   Demand is found futile if a reasonable doubt has been raised that at least half the Board members could not independently consider a demand to take legal action.

51.   Under Delaware jurisprudence, whether a plaintiff has stated a *Unocal* claim is judged under lenient Rule 12(b)(6) standards.  If such a claim is stated, then demand is considered excused, as a Board that is facing colorable claims of entrenchment has the burden of disproving the allegations, and cannot

be considered to be independent or to have acted with reasonable business judgment. *See e.g., In re Gaylord Container Corporation Shareholders Litigation*, 747 A.2d 71, 81 (Del. Ch. 1999)("So long as the plaintiff states a claim implicating the heightened scrutiny required by *Unocal*, demand has been excused under the *Aronson v. Lewis* demand excusal test.").

52.    The Activist Investor overtures were made when Emulex was facing severe business challenges, the answer to which was not expending $200 million to buy back shares (and take on huge debt), but rather to increase investment in the business. This was obvious to anyone rational, and was obvious to the Board, to its CEO and to the Activist Investors.

53.    Self-interest on the part of the Activist Investors and the threatened Board unfortunately trumped reason and rationality.  Instead of selling the Company, or holding fast against the threats being made, the Board panicked and adopted a response to the "threats" that was vastly disproportionate and devastating to the Company. It did not further the Company's business plan; it undermined it, and weakened Emulex vis-a-vis its competitors.

54.    The actions of the Board in hobbling Emulex financially in order to "save it" from premium bids were patently reckless, and cannot meet the test of reasonable business judgment.  Demand is therefore excused.

## CLAIM FOR RELIEF

(Derivatively Against the Individual Defendants for Breaches of Fiduciary Duty, Including *Unocal* Violations)

55.    Plaintiff repeats and realleges all previous allegations, set forth above, as if fully set forth herein.

56.    The Defendants, as Directors, had a duty to act with loyalty toward Emulex, and in its best interests, and with the utmost good faith.

57.    The Defendants had the obligation to respond reasonably and proportionately in response to any perceived threats to the Company's plans.

58.   The massive buyback and the debt offering do not support the Company's plans or address its business challenges.   In fact, they severely undermine the Company's ability to compete.

59.   In order to entrench themselves, and avoid a proxy contest in which a combined efforts of the Activist Investors would likely unseat them, the Defendants determined to effectuate the Defensive Buyback, which was approved so as provide the Activist Investors cash payments so as not to unseat them.   To use corporate funds to effect entrenchment is unreasonable misconduct.   Moreover, it was plain that the Defensive Buyback and Debt Offering would inflict severe and enduring financial damage upon the Company, and work to prevent it from returning superior value to shareholders.   Damages related to the Buyback and Debt Offering must be paid by the directors who approved it, the Individual Defendants.

60.   For the foregoing reasons, the Defendants named in this Cause of Action, as specified, are liable to Emulex for all damages suffered as a result of the violation of the *Unocal* standard and other conduct that is not a reasonable exercise of business judgment.

## DEMAND FOR TRIAL BY JURY

To the full extent available, Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment as follows:

A.   Awarding compensatory damages in favor of the Company against the Individual Defendants, for all damages sustained by the Company as a result of defendants' wrongful acts and misconduct as alleged herein;

B.   Awarding the Company prejudgment and post-judgment interest, and awarding Plaintiff and its counsel as well as their reasonable attorneys' fees, expert fees and other costs;

C.   Enjoining the defendants from proceeding with the Defensive Buyback; and

1         D.    Awarding such other and further relief as this Court may deem just and

2    proper.

3    Dated:  May 21, 2014          GLANCY BINKOW & GOLDBERG LLP

4

5                     By:  *s/ Lionel Z. Glancy*
                 Lionel Z. Glancy

6                     Louis N. Boyarsky

7                     1925 Century Park East, Suite 2100
                 Los Angeles, CA 90067

8                     Telephone:  (310) 201-9150

9                     Facsimile:  (310) 201-9160
                 Email:  info@glancylaw.com

10

11   OF COUNSEL:

12   Roy L. Jacobs, Esq.
**ROY JACOBS & ASSOCIATES**

13   317 Madison Avenue 21st Floor

14   New York, NY 10017
212- 867-1156

15   212-504-8343 (Fax)

16   rjacobs@jacobsclasslaw.com

17

18   Laurence D. Paskowitz, Esq.

19   **THE PASKOWITZ LAW FIRM P.C.**
208 East 51st Street, Suite 380

20   New York, New York 10022

21   212- 685-0969
212-685-2306 (fax)

22   classattorney@aol.com

23

24   *Attorneys for Plaintiff*

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

Richard Pfeffer hereby verifies that I have read the Shareholder's

Derivative Complaint brought on behalf of Emulex Corp., that I

authorize its filing and that I believe that the allegations are true to

best of my knowledge and belief.

Richard Pfeffer